NOTICE
Decision filed 12/30/24. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2024 IL App (5th) 230329-U

NO. 5-23-0329

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Champaign County. |
| | ) | |
| v. | ) | No. 20-CF-1469 |
| | ) | |
| CHRISTOBAL CRISTOBAL MATEO, | ) | Honorable |
| | ) | Roger B. Webber, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE CATES delivered the judgment of the court.
Presiding Justice McHaney and Justice Barberis concurred in the judgment.

**ORDER**

¶ 1   *Held*: The circuit court's decision to allow testimony from multiple witnesses regarding out-of-court statements made by a child under 13 describing sexual abuse was not an abuse of discretion. Trial counsel was not ineffective for failing to object to the cumulative "outcry" witnesses.

¶ 2   After a jury trial, Christobal Cristobal Mateo,[1] the defendant, was convicted of two counts of predatory criminal sexual assault of a child and sentenced to 28 years in the Illinois Department of Corrections (IDOC) and 3 years to life of mandatory supervised release. The defendant appeals whether the State's use of hearsay evidence from multiple witnesses, recounting out-of-court statements made by the victim describing sexual abuse she allegedly suffered, exceeded the scope of section 115-10 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-10 (West

_____

[1]The record referred to the defendant as Christobal Cristobal Mateo and as Cristobal Cristobal Mateo.

1

2020)), and whether the prejudicial effect of those statements outweighed any probative value. For the following reasons, we affirm the defendant's convictions and sentence.

¶ 3                                    I. BACKGROUND

¶ 4     The defendant was born in Guatemala and in 2018 moved to Champaign County with his son. They temporarily moved in with the defendant's brother, Simon Cristobal Mateo, and his brother's family. Simon was married to Marcelina Lorenzo-Esteban, and they had four children. Their oldest child was their daughter, J.C. They also had three sons. Francisco Marcos Baltazar-Marcos, and his son, also lived with Simon's family for a period of time in 2020 and 2021. The families spoke Q'anjob'al (a Mayan language spoken in Guatemala) and Spanish.

¶ 5     The defendant was charged by information with four counts of predatory criminal sexual assault (720 ILCS 5/11-1.40(a)(1) (West 2020)) of his nine-year-old niece, J.C., for an incident that occurred on December 20, 2020. Prior to trial, the State dismissed two of the counts and replaced count 1 with count 3. The State proceeded on two counts of predatory criminal sexual assault of a child including, count 1 (originally count 3), the offense of committing an act of contact between the sex organ of J.C., a child under 13, and the sex organ of the defendant for the purpose of sexual arousal of the defendant; and count 2, the offense of committing an act of contact between the sex organ of J.C., a child under 13, and the hand of the defendant for the purpose of sexual arousal of the defendant.

¶ 6            *Section 115-10 and Other Crimes Evidence Pretrial Hearing*

¶ 7     The State filed a motion *in limine*, and subsequent amended motions, asking the court to allow the presentation of multiple out-of-court statements made by J.C. pursuant to section 115-10 of the Code. Specifically, the State wanted to introduce J.C.'s statements related to her claim of sexual abuse, as well as the presentation of other crimes evidence. See 725 ILCS 5/115-10 (West

2020). The State argued that J.C.'s "outcry" statements of sexual abuse were admissible where there were sufficient safeguards of reliability and adequate corroboration. The circuit court held a motion hearing on December 20, 2021, to determine the admissibility of those statements that the State intended to elicit during trial.

¶ 8       At the hearing, J.C.'s parents, Simon and Marcelina, and their roommate, Franscisco, testified to multiple incidents involving statements made by J.C. or observations of J.C.'s behavior related to sexual abuse by the defendant. Simon's cousin also testified to his knowledge of statements made by J.C. on December 20, 2020, and had suggested that J.C. go to the hospital.

¶ 9       Dr. Justin Hoskins, a pediatric emergency physician employed by Carle Foundation Hospital, and Kaitlin Nelson, the sexual assault nurse examiner (SANE), testified that they performed a sexual assault examination on J.C. Dr. Hoskins and Nelson testified to the nature of the examination and to statements that J.C. made during the examination.

¶ 10      Mary Bunyard, a child forensic interviewer at the Champaign County Child Advocacy Center (CAC), interviewed J.C. after J.C. had presented to the emergency room as a victim of sexual abuse. Bunyard testified to the process of interviewing a child when there were allegations of child sexual abuse. J.C.'s interview with Bunyard was video recorded. After the testimony concluded, the circuit court took the State's motions *in limine* under advisement.

¶ 11      The State summarized the testimony from the motion *in limine* hearing into a chart that summarized eight incidents involving J.C. where she had demonstrated behavior or made statements indicative of sexual abuse. Each incident addressed one or more "outcry" statements that the State intended to elicit during the trial. While the court was deliberating its decision on the motions *in limine*, it subsequently held a status conference regarding the motions. At the

conclusion of the status conference, the matter remained under advisement until the circuit court issued a written decision on October 26, 2022.

¶ 12    The circuit court referred to the State's chart in its written order and found that the statements that the State intended to introduce at trial met the technical requirements of section 115-10 of the Code for the charged conduct, age of the child, and the notice to the defendant. See 725 ILCS 5/115-10 (West 2020). However, the admissibility of each of the statements depended on the reliability of the statement and whether J.C. was available and testified. If she was unavailable, the circuit court then went through the process of considering whether other corroborative evidence that accompanied a statement was available.

¶ 13    In that regard, the circuit court considered whether the statements would be admissible based on their reliability. Incident 1[2] included a statement by J.C. to Marcelina about an incident that occurred in October of 2018, where the defendant showed J.C. pornography, tickled J.C., and put his hand between her legs. J.C. also made a statement during the CAC interview regarding the same incident where the defendant had touched J.C. when she was eight years old. The circuit court found that the CAC interview had been conducted with sufficient safeguards for the reliability of the statements offered. The statements by Marcelina and the entire interview of J.C. were held admissible.

¶ 14    The circuit court made no findings of admissibility related to incidents 2, 3, and 4. Incident 5 dealt with a family gathering in November of 2019. The defendant had sexual contact with J.C. and put lotion on her. The circuit court allowed Simon to testify to J.C.'s statement made during the family gathering that the defendant put lotion on her intimate parts. The circuit court

---

[2]The incident numbers refer to the State's chart which summarized events where J.C. expressed that she was sexually abused.

additionally allowed the statement that it was "not the first time" the defendant had done something to J.C. to be admitted. The circuit court also found that testimony identified as incident 6 regarding J.C.'s conduct between the November and December incidents where she had made odd drawings and unsolicited statements to Francisco as non-hearsay and admissible.

¶ 15    The charged conduct that occurred on December 20, 2020, was identified as incident 7. The circuit court found that statements that J.C. made to her parents where she reported that the defendant had done something to her in response to being asked what was wrong was admissible. Testimony regarding J.C. producing a towel and stating that it was the towel that the defendant had used to clean himself off with was admissible. J.C.'s statement to Simon on the way to the hospital made in response to hearing the defendant's suggestion that J.C. was lying was also admissible because the circuit court found it was sufficiently spontaneous and reliable. Statements made by J.C. to Dr. Hoskins and the SANE nurse were also held admissible. The CAC interview was deemed admissible. The circuit court, however, found that J.C. nodding her head in agreement with Simon's statements made to the triage nurse on December 20, 2020, was not admissible because there were insufficient safeguards of reliability.

¶ 16    The circuit court additionally considered incident 8, statements made by J.C. after a family trip to Nebraska where she stated that she did not like what the defendant had done to her. The statement was held not admissible. The circuit court found the statement to be vague and cumulative of other statements.

¶ 17    After the circuit court considered whether the statements were admissible based on the issue of reliability, the court considered whether corroborative evidence was available if J.C. did not testify at trial. The order indicated that if J.C. was unavailable to testify, the State could only present statements made to her parents regarding the November and December incidents and the

5

statements made to Dr. Hoskins. The circuit court found that statements regarding the November incident were corroborated by J.C.'s change in demeanor, unsolicited comments concerning sexual matters, and the fact she had tested positive for a sexually transmitted disease (STD). The comments on the December incidents were corroborated by the lotion and semen found on J.C.'s clothing, by the positive STD test, and by certain admissions made by the defendant.

¶ 18                                                        *Trial*

¶ 19    A Spanish translator was present at the trial. After opening statements, the State presented Simon Cristobal Mateo as its first witness. Simon testified that he had moved to Champaign County from Guatemala in 2007 with J.C. and they temporarily lived with a cousin. The defendant and his son subsequently moved to the area, and they temporarily lived with Simon's family.

¶ 20    When Simon and his family lived with the defendant, J.C. told Simon of an incident where the defendant had "shown her a video of where there were people naked." Simon confronted the defendant about the video and the defendant denied showing J.C. a video. J.C. had overheard the conversation and called the defendant "a liar." Simon then told the defendant that "a little girl will not lie about such a thing."

¶ 21    In November of 2020, J.C. told Simon that the defendant had "rubbed some cream on me." This incident had occurred during a family gathering with multiple people in the house. At the time, Simon did not consider that the defendant was acting in a sexual nature towards J.C.

¶ 22    Simon additionally testified to the incident that occurred on a Sunday in December of 2020. The defendant and his son were at Simon's house, and the defendant was participating in the online confirmation course for their church. Francisco Baltazar and his son lived with Simon's family, and they were at the house. After the online course ended, Simon and Marcelina left to run errands

6

with their sons. Francisco also left, and his son remained at home. The defendant agreed to watch the children that wanted to stay at home, including J.C.

¶ 23    Simon testified that when he returned home with groceries, Francisco was leaving for work. Francisco told Simon that the defendant had left the children at the house unsupervised. Simon noticed that J.C. was on the couch watching television and appeared scared, as if she were in trouble. J.C. had also changed her clothes, and Simon testified that he had scolded her for changing clothes too often. Simon testified that J.C. "kind of shrinked her shoulder" in response. J.C.'s behavior prompted Marcelina to talk to J.C. and J.C. began to cry. Simon put the groceries away but was close enough to hear the conversation in the living room before he joined.

¶ 24    Simon testified that J.C. explained that the defendant was playing with J.C. and was tickling her. The defendant then picked up J.C., carried her to Simon's bedroom, rubbed "cream" on her, and "pulled his chillin out." Simon explained that J.C. used the Q'anjob'al words for body parts. She used the word "chillin" for penis and "chocho" for vagina. Simon testified that the defendant "rubbed himself" on J.C. and pushed her to the edge of Simon's bed. The defendant put his "chillin" between J.C.'s legs, and it touched her "chocho." Simon further testified that J.C. told him that she started to cry when the defendant touched her. J.C. had told Simon that it was "very painful," and the defendant saw her "almost screaming and crying." The defendant let her go when she told him to stop, and he took J.C. to her bedroom. In J.C.'s bedroom, "he started touching himself or his chillin with his hand and some white stuff came out of it."

¶ 25    After Simon and Marcelina spoke with J.C., they found semen on a towel next to J.C.'s bed. Simon had touched the corners of the towel and Marcelina helped put the towel in a bag. Simon was shown a photograph of the towel, and he testified that he gave that towel to the police later that evening.

7

¶ 26    Simon testified that he was angry and had called the defendant. The defendant claimed that J.C. made up the story. Simon then informed the defendant that he was taking J.C. to the hospital.

¶ 27    Simon took J.C. to the hospital while Marcelina stayed at home with their younger children. Simon testified that when he was driving to the hospital, the defendant called Simon. The call was on speaker phone and J.C. was able to hear the conversation. Simon also added Marcelina in a three-way conversation with the defendant. When the defendant denied doing anything, J.C. overheard and said that the defendant was lying. Simon testified that the defendant then admitted to touching J.C., "but he did not do too much to her." The defendant offered to cover expenses, "like, a psychology to get some kind of help," if Simon did not take J.C. to the hospital.

¶ 28    Simon testified that a police officer spoke to him while they were at the hospital. He gave the police officer the towel that he had collected from J.C.'s room. After Simon and J.C. returned from the hospital, police officers collected bedding and clothes from Simon's home. The day after J.C. went to the hospital, Simon took J.C. to the CAC. Simon additionally testified that the police had taken DNA samples from Simon and his three sons.

¶ 29    Marcelina testified that she arrived in Champaign from Guatemala in 2018 with two of their three sons. Their youngest son was only three years old. Marcelina testified that the defendant used to live with their family in Champaign, Illinois. Approximately six months after the defendant moved in, J.C. told Marcelina that the defendant had shown her pornographic videos. Marcelina and Simon confronted the defendant about the videos and the defendant denied showing J.C. pornography.

¶ 30    In November of 2020, there was a family gathering that the defendant attended. Marcelina believed that there was a time where J.C. was alone with the defendant during that gathering and J.C.'s behavior changed. She appeared angry and became more aggressive towards her brothers.

J.C. also started drawing people kissing each other and would scribble her drawings with dark colors.

¶ 31    Marcelina testified that on December 20, 2020, the defendant was not living with her family. The defendant came over to their house to study for a church confirmation. Marcelina went to the store with Simon and the defendant remained at the house with the children. Marcelina testified that J.C. typically will "jump up and say mama and just come towards us" when she returns home and would look through the groceries. On December 20, 2020, when Marcelina returned home, J.C. was on the couch with her arms across her chest, holding her knees, and she appeared afraid. Also, Marcelina noticed that J.C. had changed her clothes.

¶ 32    Marcelina questioned what the defendant had done, and J.C. responded that he had touched her. Simon heard that part of the conversation and asked J.C. if she was telling the truth. J.C. stated that it was true. Marcelina then took J.C. into J.C.'s bedroom to talk to her. J.C. told Marcelina that the defendant had taken her into a room, kissed her, took off her clothes, and "put his hand all over her body." J.C. had said, "mama, he put his chillin right here in my chocho." J.C. also told Marcelina that the defendant rubbed cream on J.C.'s butt and her "chocho." J.C. then showed Marcelina the cream he had used. The defendant had put his "chillin" between J.C.'s legs and then Marcelina demonstrated movements indicating what J.C. had told her about how the defendant was moving. J.C. also told Marcelina that "white stuff that—came out of it and it—it—it spilled on [J.C.'s] back hair." Marcelina continued to asked J.C. questions because she did not believe J.C. and J.C. told her that the defendant had used a towel to wipe himself off. J.C. showed Marcelina the towel and there was a stain on the towel that appeared to be semen.

¶ 33    Marcelina testified that she was scared to call the police. Simon and Marcelina decided to talk to their cousin about what they should do, and he suggested to take J.C. to the hospital. Simon

9

took J.C. to the hospital and brought the towel. After Simon left with J.C., he added Marcelina to a three-way call with the defendant. The defendant had stated that it was his fault, and he would pay for therapy if Simon did not take J.C. to the hospital.

¶ 34    The State called J.C. as a witness. Marcelina and the CAC victim advocate were allowed to remain in the courtroom. J.C. testified to the incident that occurred while her parents went to the store. J.C. testified that after her parents left, she was watching television. The defendant sat down next to J.C. and started rubbing her leg. Then, the defendant carried J.C. into her parents' bedroom, placed her on the bed, and pulled down her pants. J.C. testified that the defendant then began to touch her "privacy" with his lips.

¶ 35    J.C. testified that the defendant stopped touching her when her cousin came into the room. The defendant told her cousin to go into the other room and he left the room with J.C.'s cousin. J.C. then ran to a closet in the bedroom and pulled up her pants. The defendant returned and took J.C. into her bedroom, placed J.C. on her bed, and pulled down her pants again. J.C. testified that the defendant touched her "privacy" with his lips and his "privacy." The defendant went into the bathroom for lotion and then rubbed it on J.C.'s "privacy" with his hands. J.C. testified that another word for her "privacy" was "chocho." J.C. identified the defendant in the courtroom.

¶ 36    On cross-examination, J.C. testified that she did not remember being asked questions about the defendant when she was at the hospital. J.C. additionally did not remember going to the CAC the day after her hospital visit. J.C. also testified that she did not know when she will turn 12.

¶ 37    After J.C.'s testimony concluded, and outside of the presence of the jury, the State made an oral motion for the circuit court to make a finding that J.C. was available for cross-examination. The State sought to introduce a video of J.C. at the CAC and conceded that the video was a

testimonial statement that was only admissible if the circuit court found that J.C. was available for cross-examination.

¶ 38    In response to the State's request, the defendant argued that J.C. was not available for cross-examination and that the CAC video was not admissible. J.C. testified that she did not remember going to the CAC the day after going to the hospital. The defendant further argued that J.C. made inconsistent statements on the stand in comparison to the CAC interview. Because J.C. stated she that she did not remember the CAC interview, the defense was unable to impeach J.C. with a prior inconsistent statement.

¶ 39    The State argued that J.C. testified and was available for cross-examination. The State further argued that the defendant would be able to address J.C.'s demeanor and the credibility of her testimony during closing arguments.

¶ 40    The circuit court considered J.C.'s testimony that she did not remember the CAC interview, and that the defendant made no attempt to refresh J.C.'s recollection. The circuit court found that J.C.'s responses affected her credibility, and that she was present in court and was available for cross-examination. The State's oral motion to admit the video was granted.

¶ 41    The defense then made a motion for mistrial and argued that the circuit court's prior section 115-10 ruling was based on J.C.'s availability. J.C.'s parents both had testified that the defendant had shown J.C. pornography. J.C. did not testify as to whether the defendant had shown her pornography. The defense argued that the parents' testimony regarding pornography should not have been allowed. Additionally, the defense argued that J.C. did not testify to a date or time when the defendant "touched her privacy."

¶ 42    The State argued that hearsay testimony was admissible under section 115-10 if the child testified or if the information was corroborated by other evidence. The State argued that it intended

11

to introduce corroborative evidence that the defendant was viewing pornography on his phone. Therefore, J.C. was not required to testify about pornography. The State also argued that that J.C. was available for cross-examination and the defense chose not to question her about pornography. The circuit court denied the defendant's motion for a mistrial.

¶ 43    The trial resumed and Andrew Wilson, a patrol officer for the City of Champaign, testified next for the State. Wilson testified that he was dispatched to Carle Foundation Hospital on December 20, 2020, and spoke to Simon at the hospital. Simon gave Wilson a towel and Wilson placed the towel into a bag for evidence. Wilson also went to Simon's home with Officer Rice to collect bedding and clothing as additional evidence. Wilson testified that J.C.'s underwear was collected at the hospital as part of the sexual assault kit by the SANE nurse. Wilson received the sexual assault kit from the SANE nurse as evidence.

¶ 44    Francisco testified that on December 20, 2020, he was living with his six-year-old son at Simon's house. At one point, the defendant lived with them for approximately two months, but he had moved out before December 20. Francisco testified that on one occasion he heard J.C. use the word "sexy."[3] He believed that using that language was inappropriate for a girl of J.C.'s age. He had informed Marcelina of J.C.'s inappropriate statement.

¶ 45    Francisco testified that on December 20, 2020, he left the house to run errands at approximately 11 a.m. and his son stayed to play with Simon's sons. When he returned at approximately 5 p.m., J.C. and his son were the only people at the house. According to Francisco, J.C. was not old enough to babysit his son. Francisco testified that J.C. was normally happy, but she appeared afraid when he came back home. Francisco attempted to talk to J.C. and asked if

---

[3]Francisco spoke Q'anjob'al as well as Spanish. Francisco testified through a Spanish-language interpreter and the English word "sexy" was provided by the translator in the record.

12

something had happened, but J.C. would not talk to him. Francisco testified that when J.C. saw him, she appeared "a little more comfortable." Francisco denied ever touching J.C. inappropriately.

¶ 46 On cross-examination, Francisco testified that the children liked to watch television and there was Wi-Fi at Simon's house. He never saw J.C. watching a show that was sexual in nature.

¶ 47 The State sought to call a cousin of Simon as a witness. The defense objected because he was not on the witness list. The State informed the circuit court that Simon would testify that this cousin was at Simon's house on the night of the incident and had discussed taking J.C. to the hospital or calling the police. He also saw the towel and may have picked up the towel. The circuit court found that the testimony of the cousin would be cumulative, and he had not been disclosed. The circuit court sustained the defendant's objection, and the cousin was not allowed to testify.

¶ 48 Kaitlin Fisher, a sergeant with the Champaign Police Department, testified that she had taken the defendant into custody. Fisher confiscated the defendant's cell phone. She also obtained a buccal swab from the defendant. Fisher additionally collected buccal swab samples from Simon, his three sons, and Francisco.

¶ 49 Justin Hoskins, a pediatric emergency physician at the Carle Foundation Hospital, testified that he had examined J.C. on December 20, 2020. Dr. Hoskins met Simon who briefly explained why J.C. was at the hospital. Dr. Hoskins also spoke with J.C. outside of the presence of Simon. J.C. was able to explain, through a translator, that the defendant had "touched her little body" and motioned to her private area. Dr. Hoskins testified that he was a mandated reporter and had to clear J.C.'s discharge from the hospital with the Department of Children and Family Services (DCFS). It was important to determine the identity of the person that had touched J.C. to ensure that she could be discharged safely and not with someone who would continue to cause harm.

¶ 50    Dr. Hoskins testified that a sexual assault examination was performed. No injuries to the genital area were observed. During J.C.'s examination, the SANE nurse collected a genetic sample which was sealed within the sexual assault kit. J.C. provided a urine sample to test for gonorrhea and chlamydia. The test was positive for chlamydia which indicated that she contracted it sexually. Dr. Hoskins explained that a patient would be able to test positive for chlamydia instantaneously upon exposure to the bacteria.

¶ 51    Kaitlyn Nelson, a SANE nurse at Carle Foundation Hospital, testified that she performed a sexual assault examination of J.C. During that examination, Nelson performed four different external vaginal swabs of J.C. and collected her underwear for the evidence collection kit. Nelson sealed the collected evidence in the sexual assault evidence kit and handed the kit to Officer Wilson. Nelson did not observe any tears, abrasions, or bruising to J.C. Nelson testified that it would not be unusual for a victim of sexual assault of J.C.'s age to not have any tears, abrasions, or bruising.

¶ 52    Yi-Hung Kuo, a DNA analyst at Bode Technology, testified that he performed a DNA analysis of three samples, including a vaginal swab from J.C., a reference standard for J.C., and a reference standard for the defendant. The DNA profile obtained from the vaginal swab was consistent with J.C.'s reference standard. Kuo was unable to reach any conclusions of whether there was male DNA in the swab. Kuo additionally testified that Y-STR testing was not covered by his contract with the Illinois State Police.

¶ 53    The circuit court read stipulations by the parties to the jury. The stipulations included proper handling of evidence, and that J.C. was positive for chlamydia on December 20, 2020.

¶ 54    G. David Frye, a digital forensic examiner in the High-Tech Crime Unit of the Champaign Police Department, testified to his analysis of data acquired from the defendant's cell phone. Fyre

testified to finding pornographic material on the defendant's cell phone. Videos had been downloaded and the defendant's web browser had a large amount of activity on pornography websites. On December 21, 2020, the defendant's search history revealed a search for the last Greyhound bus to Los Angeles.

¶ 55    Mary Bunyard, a child forensic interviewer at the CAC, testified to her interview of J.C. that occurred on December 22, 2020. The interview was video recorded. During the interview, Bunyard had shown an anatomical diagram to J.C. and J.C. drew a circle on the vaginal area of the drawing. The diagram and the video interview were admitted into evidence.

¶ 56    Jennifer Aper, a forensic scientist at the Illinois State Police Springfield Forensic Science Laboratory, testified that she received the sexual assault kit for J.C. Aper also testified that she manages sending evidence to Bode Laboratory and reviews the results of their analysis. Bode Laboratory only conducted an autosomal DNA analysis under their contract with the Illinois State Police. Aper sent some of the samples from the sexual assault kit to Bode Laboratory for analysis. After Bode Laboratory completed their analysis, the evidence was returned to the lab in Springfield. Aper reviewed the results and completed a Y-STR analysis on the vaginal swabs. Aper concluded that there was male DNA present in the extract of the vaginal swab. Aper had also received swabs from Simon, Francisco, and J.C.'s brothers and developed DNA profiles for each. The Y-STR analysis did not exclude any of the samples received from J.C.'s relatives from being possible contributors to male DNA found in the vaginal swab. Fransisco was excluded as being a contributor.

¶ 57    Aper additionally testified that she performed a DNA analysis on J.C.'s underwear included in the sexual assault evidence kit. No semen was found in J.C.'s underwear. Aper testified that the DNA sample found in J.C.'s underwear could have been spit, sweat, skin cells, or other

15

DNA. The defendant, Simon, and two of J.C.'s brothers were both included as possible contributors to the DNA found in J.C.'s underwear.

¶ 58    Aper testified that she performed a DNA analysis on the semen found on the towel included in the sexual assault evidence kit. Aper completed an autosomal STR-PCR analysis and compared the semen recovered to the DNA profiles. Simon, Francisco, and J.C.'s brothers were all excluded as contributors. The defendant was included as a possible contributor. Aper additionally testified that "approximately 1 in 130 nonillion unrelated individuals would be expected to be a contributor of that DNA profile" and therefore, Aper opined that the defendant's semen was found on the towel.

¶ 59    After Aper's testimony concluded, two video clips from J.C.'s interview at the CAC were published to the jury. After the jury viewed the video clips, the State rested. The defense then moved for a directed verdict and the circuit court denied the motion. The defense then rested.

¶ 60    The parties presented their closing arguments. After the jury deliberated, they found the defendant guilty of two counts of predatory criminal sexual assault of a child.

¶ 61    The defendant filed a motion for acquittal or, in the alternative, a motion for a new trial. The defense argued that the circuit court relied on improper corroborative evidence during the section 115-10 hearing and that the court's ruling on the motion would have been different without the improper evidence. The defense additionally argued that the circuit court made several errors on evidentiary rulings during the trial.

¶ 62    The circuit court reviewed its written order on the prior section 115-10 motion which found that if J.C. was unavailable to testify, sufficient corroborative evidence satisfied section 115-10 of the Code. See 725 ILCS 5/115-10 (West 2022). Because J.C. was available and had testified at trial, the testimony was admissible regardless of the other corroborative evidence. The circuit court

16

additionally considered the numerous evidentiary objections and denied the defendant's motion for acquittal, or in the alternative, motion for a new trial.

¶ 63    The defendant was sentenced to two consecutive 14 years sentences in the IDOC followed by mandatory supervised release of 3 years to natural life. The defendant filed a motion for reconsideration of his sentence and requested that the circuit court reduce the imposed sentence. The circuit court denied the motion and this appeal followed.

¶ 64                                    II. ANALYSIS

¶ 65    On appeal, the defendant argues that he was denied a fair trial where the minor victim testified and multiple witnesses provided hearsay evidence describing sexual abuse, in violation of the prohibition against prior consistent statements which exceeded the scope of the hearsay exception under section 115-10  of the Code (725 ILCS 5/115-10 (West 2022)). The defendant further claims that the prejudicial effect of this evidence outweighed any probative value. The defendant additionally argues that trial counsel was ineffective for failing to preserve this issue on appeal.

¶ 66    " 'Hearsay evidence is an out-of-court statement offered to prove the truth of the matter asserted, and it is generally inadmissible due to its lack of reliability unless it falls within an exception to the hearsay rule.' " *People v. Caffey*, 205 Ill. 2d 52, 88 (2001) (quoting *People v. Olinger*, 176 Ill. 2d 326, 357 (1997)). Additionally, statements made prior to trial for the purpose of corroborating trial testimony are generally inadmissible. *People v. Emerson*, 97 Ill. 2d 487, 501 (1983). "The danger in prior consistent statements is that a jury is likely to attach disproportionate significance to them." *People v. Smith*, 139 Ill. App. 3d 21, 33 (1985). Furthermore, "[p]eople tend to believe that which is repeated most often, regardless of its intrinsic merit, and repetition lends credibility to testimony that it might not otherwise deserve." *Smith*, 139 Ill. App. 3d at 33.

¶ 67    In cases involving the sexual assault of young children, a hearsay exception allows

corroborative testimony that the child complained to another person about the incident. *People v.*

*Holloway*, 177 Ill. 2d 1, 9 (1997). Under section 115-10 of the Code, certain hearsay exceptions

are allowed,

> "(a) In a prosecution for a physical or sexual act perpetrated upon or against a child under the age of 13 *** including, but not limited to, prosecutions for violations of Sections 11-1.20 through 11-1.60 *** of *** the Criminal Code of 2012 ***, the following evidence shall be admitted as an exception to the hearsay rule:
>
>> (1) testimony by the victim of an out of court statement made by the victim that he or she complained of such act to another; and
>>
>> (2) testimony of an out of court statement made by the victim describing any complaint of such act or matter or detail pertaining to any act which is an element of an offense which is the subject of a prosecution for a sexual or physical act against that victim.
>
> (b) Such testimony shall only be admitted if:
>
>> (1) The court finds in a hearing conducted outside the presence of the jury that the time, content, and circumstances of the statement provide sufficient safeguards of reliability; and
>>
>> (2) The child or person with an intellectual disability, a cognitive impairment, or developmental disability either:
>>
>>> (A) testifies at the proceeding; or
>>>
>>> (B) is unavailable as a witness and there is corroborative evidence of the act which is the subject of the statement; and
>>
>> (3) In a case involving an offense perpetrated against a child under the age of 13, the out of court statement was made before the victim attained 13 years of age or within 3 months after the commission of the offense, whichever occurs later, but the statement may be admitted regardless of the age of the victim at the time of the proceeding." 725 ILCS 5/115-10(a), (b) (West 2022).

¶ 68    "Section 115-10 of the Code should be narrowly construed." *People v. Bridgewater*, 259

Ill. App. 3d 344, 349 (1994). *Bridgewater* held that,

18

"in order for a hearsay statement to be admissible under section 115-10 of the Code, the child must be under the age of 13 at the time the statement was made. This result is consistent with the statutory purpose. An immature victim, a victim under the age of 13, may find it difficult to testify at trial. Such a victim may also be less likely to manipulate his out-of-court statements. The same may not be true of older victims." *Bridgewater*, 259 Ill. App. 3d at 349.

¶ 69    "The prejudicial nature of evidence of prior consistent statements is judged on a case-by-case basis." *Caffey*, 205 Ill. 2d at 110. The circuit court's decision to allow hearsay statements under section 115-10 of the Code will not be reversed absent an abuse of discretion. *People v. Williams*, 193 Ill. 2d 306, 343 (2000).

¶ 70    J.C. was 9 years old when the charged incidents of predatory criminal sexual assault occurred and 11 years old when she testified at trial. J.C. met the requirements of section 115-10(a) of being a child under 13 years when she made the "outcry" statements of a sexual attack to her parents and to the CAC worker. See 725 ILCS 5/115-10(a) (West 2022). The circuit court held a pretrial hearing, outside the presence of the jury, and determined that the time, content, and circumstances of the statements provided sufficient safeguards of reliability as required by section 115-10(b)(1). See 725 ILCS 5/115-10(b)(1) (West 2022). Additionally, J.C. testified at the trial and was available for cross-examination by the defendant. See 725 ILCS 5/115-10(b)(2) (West 2022).

¶ 71    While the defendant concedes that section 115-10 of the Code allows for the "outcry" statements by J.C., the defendant argues that "[a] single evidentiary issue may be subject to more than one rule." See *People v. Dabbs*, 239 Ill. 2d 277, 289 (2010). The defendant argues that the State improperly bolstered its case by using numerous statements, made by the victim to her parents and to a forensic interviewer during her CAC interview, and those statements exceeded the scope of section 115-10 of the Code where J.C. adequately testified at trial. See 725 ILCS 5/115-10 (West 2022).

19

¶ 72    As in this case, the defendant in *People v. Applewhite* argued that "corroborative hearsay statements are barred from admission under section 115-10 of the Code if they are consistent with a minor's trial testimony." *People v. Applewhite*, 2016 IL App (4th) 140558, ¶ 65. In *Applewhite*, the court found the defendant's argument was inconsistent with the following two principles:

> "First, that the admission of out-of-court statements under section 115-10 of the Code is predicated on the trial court's judgment as to the reliability of the corroborative hearsay statements.
>
> Second, and more important, provided that the remaining provisions of section 115-10 are satisfied, whether a minor victim testifies consistently, inconsistently, or by not responding to questions posed regarding the sexual acts alleged does not affect the admissibility—under section 115-10—of the minor's out-of-court statements to others that detailed a defendant's sexual acts." *Applewhite*, 2016 IL App (4th) 140558, ¶ 65.

Additionally, when a prior statement is offered at trial as substantive evidence under an exception to the hearsay rule, a consistent statement made by the declarant during trial does not make the prior statement inadmissible. *People v. Stull*, 2014 IL App (4th) 120704, ¶ 100. Thus, we reject the defendant's argument that prior statements were inadmissible because J.C. competently testified at trial.

¶ 73    The defendant additionally argues that the probative value of admitting multiple prior consistent statements was outweighed by the prejudicial effect. The defendant acknowledged that multiple appellate courts have rejected similar arguments. The defendant nevertheless argues that the introduction of multiple hearsay statements was inadmissible as prejudicial cumulative evidence in this case. We disagree.

¶ 74    In *People v. Branch*, we considered that numerous cases have allowed multiple corroborating witnesses to testify on a victim's behalf and found that in general, youthful victims lack credibility and often have difficulties articulating when testifying. *People v. Branch*, 158 Ill. App. 3d 338, 341 (1987). "Section 115-10 contains no limitation on the number of witnesses who

may testify." *People v. Moss*, 275 Ill. App. 3d 748, 756 (1995). In *Moss*, the victim's brother, a doctor, and two policemen testified to the victim's outcry statements. *Moss*, 275 Ill. App. 3d at 748. In *People v. Lofton*, the court found that "[w]itnesses who are close to a child victim or have interviewed the victim should not be curtailed from testifying and aiding the victim simply because of their numbers." *People v. Lofton*, 303 Ill. App. 3d 501, 508 (1999). In *Lofton*, the victim's mother, a nurse, a DCFS worker, and a police officer all testified to outcry statements. *Lofton*, 303 Ill. App. 3d at 508.

¶ 75    J.C. informed multiple witnesses, within hours, of the sexual abuse she had endured, and she provided a detailed description of the abuse. The circuit court thoroughly addressed each of the eight incidents that the State intended to introduce at trial in its written order after considering the evidence presented in the section 115-10 pretrial motion hearing. The circuit court was cognizant of the cumulative nature of the testimony and barred testimony related to statements J.C. made about the defendant when she was on a trip to Nebraska, identified as incident 8. The admissible testimony, of multiple witnesses, was determined after the circuit court considered that the time, content, and circumstances of the statements provided sufficient safeguards of reliability. The circuit court did not abuse its discretion by allowing multiple witnesses to provide corroborative testimony as allowed under section 115-10 of the Code.

¶ 76    When determining whether a defendant was denied effective assistance of counsel, the defendant must demonstrate that counsel's performance was deficient where it fell below an objective standard of reasonableness, and the deficient performance prejudiced the defendant such that he was deprived of a fair trial. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). Both prongs of the *Strickland* test must be satisfied by the defendant for a finding of ineffectiveness.

21

*People v. Veach*, 2017 IL 120649, ¶ 30. Ineffective assistance of counsel claims are generally reviewed *de novo*. *People v. Gunn*, 2020 IL App (1st) 170542, ¶ 91.

¶ 77     To establish deficient performance, the defendant must demonstrate that his trial counsel's performance was "objectively unreasonable under prevailing professional norms." (Internal quotation marks omitted.) *Gunn*, 2020 IL App (1st) 170542, ¶ 94. The defendant must overcome a strong presumption that trial counsel's inaction was based on sound trial strategy. *People v. Perry*, 224 Ill. 2d 312, 341-42 (2007). "Counsel cannot be considered ineffective for failing to make or pursue what would have been a meritless motion or objection." *People v. Rogers*, 2021 IL 126163, ¶ 32.

¶ 78     When considering the second prong of the *Strickland* test, the defendant must demonstrate that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Gunn*, 2020 IL App (1st) 170542, ¶ 96. Where the evidence against the defendant is overwhelming, the reviewing court will not be persuaded that it is reasonably probable that a jury would have acquitted the defendant in the absence of counsel's alleged errors. *Gunn*, 2020 IL App (1st) 170542, ¶ 96.

¶ 79     The evidence against the defendant in this case is overwhelming. The evidence demonstrated that a nine-year-old child was presented to the emergency room with a sexually transmitted disease immediately after she was left alone with the defendant. The victim informed her parents, the doctor, and SANE nurse that the defendant sexually abused her within hours of the charged incidents of abuse. The minor victim additionally informed a CAC interviewer soon after the incident and the victim testified at trial against the defendant. The defendant's DNA was found in a towel in the minor victim's bedroom. Additionally, trial counsel was not ineffective for failing to make a meritless objection to the cumulative testimony of Simon, Marcelina, and

22

Bunyard as allowed under section 115-10 of the Code where the circuit court did not abuse its discretion by allowing testimony of the "outcry" statements made by the minor victim. See 725 ILCS 5/115-10 (West 2022).

¶ 80                                    III. CONCLUSION

¶ 81    For the foregoing reasons, the defendant's convictions and sentence are affirmed.

¶ 82    Affirmed.